IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

OTIS PHILLIPS,                          :
                                        :
                Petitioner,             :
                                        :
        v.                              :        Civil Action No. 20-1054-CFC
                                        :
ROBERT MAY, Warden,                     :
and ATTORNEY GENERAL OF THE             :
STATE OF DELAWARE,                      :
                                        :
                Respondents.            :

_____

## **MEMORANDUM OPINION**

Otis Phillips. *Pro se* Petitioner.

Elizabeth R. McFarlan, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

September 28, 2023
Wilmington, Delaware

CONNOLLY, CHIEF JUDGE:

Pending before the Court is a Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 filed by Otis Phillips.  (D.I. 3; D.I. 12)  The State filed an Answer in opposition, to which Petitioner filed a Reply.  (D.I. 19;  D.I. 22)  For the reasons discussed, the Court will deny the Petition.

## I.     BACKGROUND

On January 27, 2008, Christopher Palmer was shot and killed inside an after-hours nightclub in Wilmington, Delaware. Herman Curry witnessed the murder. More than four years later, on July 8, 2012, Curry and Alexander Kamara were shot and killed during a soccer tournament at Eden Park in Wilmington, Delaware. Wilmington Police Department ("WPD") officers investigated the 2008 and 2012 murders. The investigations revealed that the suspects in the homicides, [Petitioner] and Jeffrey [Phillips ("Jeffrey")], were members of a criminal gang known as the "Sure Shots."

***Christopher Palmer Murder***.  There was a birthday party for Curry on January 27, 2008 at a nightclub on Locust Street in Wilmington.  Palmer, the security guard responsible for checking guests for weapons prior to entry, denied three individuals—believed to be [Petitioner], Jovani Luna, and Dwayne Kelly—entry into the club because "one or more of them was armed."  A bystander, Clayon Green, witnessed the trio of men return and saw one of them push Palmer after he was again denied entry.  According to Green, "Palmer and his assailant fell into a nearby bathroom, [Petitioner] 'reached around' into the bathroom and Green heard three shots."  Palmer died as a result of the gunshot wounds.  Curry also witnessed the incident and identified [Petitioner] as Palmer's shooter in a photo lineup.  Afterwards, Kelly told Paula Thompson—his girlfriend at the time—that he and [Petitioner] were going to New York and Kelly did not see [Petitioner] after that visit.

***Nightclub Incident***. Four years later, on July 7, 2012, Jeffrey was involved in a shooting at The River nightclub. According to the State, Kelmar Allen's testimony established that Allen removed Jeffrey from the club after Jeffrey got into an altercation with a rival gang member. As Allen and Kirt Williams waited for an elevator, Christopher Spence shot at them, "killing Williams and wounding Allen." After running outside, Allen "saw Jeffrey firing a .40 caliber gun at a person named 'Mighty,' " a rival gang member. The next day, Allen saw Jeffrey at a house on Lamotte Street, where he and other Sure Shots members were "collecting guns and bullets in the basement of the home." According to Allen, the members were angry because they wanted to find the rival gang members from the night before. The Sure Shots leader, Seon Phillips ("Seon", [Petitioner's] brother, no relation to Jeffrey), loaded a .40 caliber gun and gave it to Jeffrey.

***Eden Park Murder***. On July 8, 2012, Curry organized an annual soccer tournament at Eden Park in Wilmington, Delaware. While Ricardo Brown was preparing food at the outdoor kitchen with Curry, he noticed two men walk through a gate onto the soccer field. Shortly after that, he heard "fire rockets go off" and "turned and saw one of the men shoot Curry while the other shot his gun 'wild[ly].'" Curry and Kamara died as a result of their gunshot wounds (the "Eden Park Homicides").

There were other witnesses to the homicides. Nearby soccer player, Raoul Lacaille saw two men approach Curry, tap him on the shoulder, and shoot him, identifying [Petitioner] as Curry's shooter. Omar Bromfield also heard what he described as firecrackers, saw a crowd running through the parking lot, and discovered shortly after that he had been shot. Venus Cherry, a tournament participant, saw two men enter the field, approach Curry, tap him on the shoulder, and one said, "Ninja, run, pussy, today you are dead," prior to shooting him. According to Cherry, "[t]he second man turned toward the 'kitchen' area and fired his gun; a bullet hit Kamara and Cherry." Cherry identified [Petitioner] as Curry's shooter and Jeffrey as Kamara's shooter.

2

Green witnessed [Petitioner] and Jeffrey walk across the field and then "saw [Petitioner] shoot at Curry, and Jeffrey shoot toward the parking lot as if to clear the way." Green then saw [Petitioner] and Jeffrey return to a gold car, and saw Christopher Spence approach the car and shoot the driver, Serge. Minutes after the shooting, officers found the gold car crashed at a nearby intersection. Officer Corey Staats found a handgun on the rear seat, "and observed the semi-conscious driver bleeding from his torso." Upon searching the vehicle, police discovered a 9 mm handgun, .40 caliber handgun, and black baseball cap containing DNA that matched that of [Petitioner]. According to firearm examiner Carol Rone, the shell casings collected from the Eden Park crime scene were fired from the recovered firearms.

Officers searched the surrounding area for the two men who had fled from the crashed gold car and located [Petitioner] and Jeffrey in a back yard approximately four blocks north of Eden Park. A brief standoff followed, and then the officers arrested [Petitioner] and Jeffrey. The police noticed Jeffrey was wounded from a gunshot in the leg and discovered 20 rounds of 9 mm ammunition in his pants pocket.

The State's primary witness against [Petitioner] and Jeffrey was Allen. Prior to trial, Allen pled guilty to Gang Participation. The sentence imposed by the trial judge was a period of incarceration suspended for time served (119 days) followed by level III probation.

***Gang Participation***. [Petitioner] and Jeffrey actively participated in the Sure Shots gang. In addition to the murders of Palmer, Curry, and Kamara, they participated in other gang-related activity. Maria Dubois testified that she had been a member of the gang since 2003. She sold drugs for the gang and had daily contact with other gang members, including [Petitioner]. Dubois was present at The River nightclub when Palmer was killed. She testified that [Petitioner] was present that evening and, while she did not see him with a firearm at that time, he carried a firearm "as

often as he needed." Dubois did not remember seeing [Petitioner] after the Palmer murder.

Michael Young joined the Sure Shots gang in 2003. He sold drugs for the gang on 7th Street in Wilmington. According to Young, [Petitioner] was also a member of the gang and would always fire a gun in the air after being at a club that closed down for the evening. On May 5, 2007, Young, [Petitioner], Dwayne Kelly and other members of the Sure Shots gang were at the nightclub at 8th and Adams Street. When the group left the nightclub, Young approached Harris and lifted his shirt, thinking that Harris was armed. Harris pushed Young's arm away, and [Petitioner] immediately punched him. Kelly then hit Harris in the head with a handgun, stepped back, and shot him one time. [Petitioner] and Kelly fled to a nearby home where Kelly's girlfriend lived.

As a result of the Palmer, Curry, and Kamara murders, the assault and shooting of Antoine Harris, the illegal possession and use of firearms, and the illegal possession and distribution of controlled substances, [Petitioner] was charged with three counts of Murder in the First Degree, Attempted Murder in the First Degree, Assault First Degree, Gang Participation, Conspiracy First Degree, Reckless Endangering in the First Degree, six counts of Possession of a Firearm During the Commission of a Felony, Conspiracy Second Degree, and PDWBPP. The Superior Court conducted a joint trial of [Petitioner] and Jeffrey.

*Philips v. State*, 154 A.3d 1130, 1135-37 (Del. 2017).

In October 2012, Petitioner and nine other co-defendants were charged by a 24-count indictment with gang participation and charges associated with the activities of the Sure Shots gang. (D.I. 18-4 at 43-56) Specifically, Petitioner was charged with three counts of first degree murder (Palmer, Curry, Kamara), attempted first degree murder, first degree assault, gang participation, first degree conspiracy, first degree reckless endangering, and six counts of possession of a firearm during the commission of a

4

felony ("PFDCF").  (D.I. 18-4 at 43-56)  On February  2013, a 54-count reindictment was

issued, charging Petitioner and fifteen other co-defendants with gang participation and

charges associated with the activities of the Sure Shots gang.  Specifically, the

reindictment charged Petitioner with the original 14 counts and one new count of

second-degree conspiracy.  (D.I. 18-4 at 57-85)

> The Superior Court denied severance motions and conducted
> a joint capital trial of co-defendants [Petitioner] and Jeffrey [].
> The jury found [Petitioner] guilty of Murder in the First Degree,
> Murder in the Second Degree (as a lesser-included offense of
> Murder in the First Degree), Manslaughter (as a lesser-
> included offense of Murder in the First Degree), Gang
> Participation, Conspiracy in the First Degree, five counts of
> Possession of a Firearm During the Commission of a Felony,
> Assault Third Degree (as a lesser-included offense of Assault
> in the First Degree), Assault Second Degree, and Reckless
> Endangering. The jury acquitted him of one count of PFDCF
> and Conspiracy Second Degree.
>
> The Superior Court conducted a four-day penalty hearing.
> The jury found, unanimously and beyond a reasonable doubt,
> two statutory aggravating circumstances: that [Petitioner's]
> "course of conduct resulted in the deaths of two or more
> persons where their deaths [were] the probable consequence
> of [Petitioner's] conduct"; and that the "murder was
> premeditated and a result of substantial planning." The jury
> weighed the aggravating and mitigating circumstances
> presented and unanimously found by a preponderance of the
> evidence that the aggravating circumstances outweighed the
> mitigating circumstances. The Superior Court sentenced
> [Petitioner] to death for Murder in the First Degree, life
> imprisonment for Murder in the Second Degree, and 130
> years of incarceration for the remaining offenses.

*Phillips*, 154 A.3d at 1134-35.

Petitioner appealed.  On January 17, 2017, the Delaware Supreme Court affirmed his convictions but, because Delaware's death penalty had been found unconstitutional after his sentencing,[1] vacated Petitioner's sentence and remanded the case for resentencing "on the conviction of Murder in the First Degree to 'imprisonment for the remainder of his natural life without benefit of probation or parole or any other reduction.'"  *Phillips*, 154 A.3d at 1135, 1146.

On March 6, 2017, Petitioner filed in the Delaware Superior Court a *pro se* motion for post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61, asserting nine ineffective assistance of counsel claims ("*pro se* Rule 61 motion"), along with a motion to appoint counsel.  (D.I. 18-17 at 72-83)  The Superior Court appointed counsel to represent Petitioner in his Rule 61 proceeding.  (D.I. 18-17 at 84)  On April 15, 2019, appointed counsel filed an amended Rule 61 motion ("Rule 61 motion") asserting one ineffective assistance of trial counsel claim on Petitioner's behalf.  (D.I. 18-17 at 85-118)  On October 1, 2019, a Delaware Superior Court Commissioner issued a Report and Recommendation finding that Petitioner's Rule 61 motion should be denied.  *See State v. Phillips*, 2019 WL 4805824 (Del. Super. Ct. Oct. 1, 2019).  On November 20, 2019, the Superior Court adopted the Report and Recommendation and denied Petitioner's Rule 61 motion.  *See State v. Phillips*, 2019 WL 6174440 (Del. Super. Ct. Nov. 20, 2019).  Petitioner appealed that decision, and the Delaware Supreme Court affirmed the Superior Court's judgment on July 21, 2020.  *See Phillips v. State*, 237 A.3d 67 (Table), 2020 WL 4196649, at *4 (Del. July 21, 2020).

---

[1]*See Rauf v. State*, 145 A.3d 430 (Del. 2016) (holding that Delaware's death penalty statute is unconstitutional); *see also Powell v. State*, 153 A.3d 69 (Del. 2016) (finding that *Rauf*'s holding applies retroactively).

## II.   GOVERNING LEGAL PRINCIPLES

### A.  The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA) "to reduce delays in the execution of state and federal criminal sentences . . .

and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*,

538 U.S. 202, 206 (2003).  Pursuant to AEDPA, a federal court may consider a habeas

petition filed by a state prisoner only "on the ground that he is in custody in violation of

the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Additionally, AEDPA imposes procedural requirements and standards for analyzing the

merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure

that state-court convictions are given effect to the extent possible under law." *Bell v.

Cone*, 535 U.S. 685, 693 (2002).

### B.  Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief

unless the petitioner has exhausted all means of available relief under state law.  *See*

28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v.

Connor*, 404 U.S. 270, 275 (1971).  AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the
> courts of the State; or
>
> (B)(i) there is an absence of available State corrective
> process; or (ii) circumstances exist that render such process
> ineffective to protect the rights of the applicant.

7

28 U.S.C. § 2254(b)(1). This exhaustion requirement, based on principles of comity, gives "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989). A federal legal claim is "fairly presented" to state courts when there is: "(1) reliance on pertinent federal cases employing constitutional analysis; (2) reliance on state cases employing constitutional analysis in like fact situations; (3) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; [or] (4) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *McCandless v. Vaughn,* 172 F.3d 255, 261 (3d Cir. 1999). If the petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does not need to raise the same issue again in a state post-conviction proceeding. *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1997).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available);

*see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). Such claims, however, are procedurally defaulted. *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[2] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451

---

[2]*Murray*, 477 U.S. at 496.

(2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

## C. Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). As explained by the Supreme Court, "it

may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. *See* § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III.    DISCUSSION

Petitioner's timely filed original Petition asserts 20 grounds for relief. (D.I. 3) In his AEDPA Election Form, Petitioner indicated that he wished to amend his Petition within 30 days. (D.I. 10) Almost three full months later, Petitioner filed a document titled "Memorandum of Law in Support of Petition" ("Memorandum in Support"). (D.I. 12) The Memorandum: (1) provides support for Claims One, Two, and Ten of the Petition; (2) asserts two new grounds alleging that trial counsel provided ineffective assistance (trial counsel failed to recuse despite concurrently representing a State's witness and trial counsel failed to present evidence to contradict ballistic evidence produced by the State); and (3) asserts one new ground that appellate counsel provided ineffective assistance by not filing a new appeal once his death sentence was overruled and he was resentenced. (D.I. 12 at 4, 5, 27, 36) The State filed an Answer responding only to the six grounds presented in the Memorandum in Support, asserting that it views

11

the Memorandum in Support as the amended petition mentioned in Petitioner's AEDPA

Election Form. (See D.I. 19 at 14 n.5) The Court does not view the Memorandum in

Support as an amended petition but, rather, as a Memorandum in Support that also

asserts three new grounds for relief. Therefore, the Court views the instant Petition and

Memorandum in Support as asserting the following twenty-three Claims:[3]

> 1. The trial judge erred by not recusing himself from the
> penalty phase after receiving ex parte information about
> Petitioner. (D.I. 3 at 5; D.I. 12 at 4)
>
> 2. The trial court abused its discretion by denying
> Petitioner's motion to sever (D.I. 3 at 7), and the trial court's
> decision not to sever the Palmer murder from the Curry
> murder from his co-defendant's case was contrary to clearly
> established federal law. (D.I. 12 at 5, 39-46)
>
> 3. The admission of a co-conspirator's statement relating to
> gang participants violated the Confrontation Clause. (D.I. 3
> at 8)
>
> 4. The admission of a co-conspirator's plea violated the
> Confrontation Clause. (D.I. 3 at 10)
>
> 5. A mistrial should have been granted when a witness
> commented on Petitioner's failure to testify. (D.I. 3 at 12)
>
> 6. Delaware's death penalty statute is unconstitutional.
> (D.I. 3 at 14)

_____

[3]The Court notes that Petitioner's Reply Brief (D.I. 22) appears to assert a new claim for
relief, namely, that postconviction counsel was ineffective for not arguing that "newly
discovered evidence" of recent misconduct by the State's ballistics expert, Carl Rone,
demonstrates that the testimony Rone provided during his trial was false. (D.I. 22 at 4-
5) There is no federal constitutional right to counsel in collateral proceedings, and
freestanding claims of ineffective assistance of postconviction counsel are not
cognizable on federal habeas review. See 28 U.S.C. § 2254(i) ("The ineffectiveness or
incompetence of counsel during Federal or State collateral post-conviction proceedings
shall not be a ground for relief in a proceeding arising under section 2254."); Coleman,
501 U.S. at 752; Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). Thus, regardless of
whether the new claim should be viewed as a proper amendment to the Petition, the
Court summarily rejects Petitioner's instant argument because it fails to present a
proper basis for federal habeas relief.

7.  The trial court erred by granting the State's motion in limine based upon the doctrine "forfeiture by wrongdoing." (D.I. 3 at 15)

8.  The trial judge's statement to the jury was overly suggestive.  (D.I. 3 at 17)

9.  Petitioner's speedy trial rights were violated.  (D.I. 3 at 19)

10.  Trial counsel provided ineffective assistance by failing to conduct a pretrial investigation into Petitioner's alibi defense. (D.I. 3 at 21; D.I. 12 at 4)

11.  Trial counsel provided ineffective assistance by not requesting a mistrial based on the fact that Dr. Victor Weedn testified about the autopsy instead of Dr. Callary – the person who performed the autopsy.  (D.I. 3-1 at 2)

12.  Trial counsel provided ineffective assistance by failing to request a mistrial based on Carl Rone's testimony.  (D.I. 3-1 at 2)

13.  Trial counsel provided ineffective assistance by failing to have Carl Rone's testimony stricken.  (D.I. 3-1 at 3)

14.  Trial counsel failed to argue that the FBI's forensic examiner's testimony raised a reasonable doubt about the 2008 charges because it introduced the possibility of a different shooter (Luna).  (D.I. 3-1 at 3)

15.  Trial counsel was ineffective for not moving to have Juror #5 dismissed.  (D.I. 3-1 at 4)

16.  Trial counsel was ineffective for not making sure Petitioner was in the courtroom when discussing the issue of Juror #5.  (D.I. 3-1 at 5)

17.  Trial counsel failed to request voir dire concerning Juror #10's communication with the State's prosecutor and detective.  (D.I. 3-1 at 5)

18.  Trial counsel did not request a colloquy to discuss the prosecutor's emotions during the penalty phase of his trial. (D.I. 3-1 at 5)

> 19. Trial counsel failed to raise the issue the Petitioner was acting in self-defense with respect to Curry's shooting. (D.I. 3-1 at 6)
>
> 20. Trial counsel provided ineffective assistance by not moving for a mistrial due to the fact that Petitioner was deprived of his right to be tried by a jury of twelve. (D.I. 3 at 23; D.I. 24 at 4-11)
>
> 21. The trial judge engaged in ex parte communication with the State regarding his co-defendant's plan to "eliminate" the prosecutor. (D.I. 12 at 4)
>
> 22. Trial counsel was ineffective for: (a) not recusing based on concurrent representation of a State's witness; (b) not presenting evidence contradicting the ballistic evidence produced by the State; and (c) trial counsel's "perfunctory attempt at a severance motion" denied Petitioner his "Fifth, Sixth, and Fourteenth Amendments to a fair trial." (D.I. 12 at 5, 27, 36, 39)
>
> 23. Appellate counsel provided ineffective assistance by not filing a new appeal once his death sentence was vacated and he was resentenced. (D.I. 12 at 4)

## A. Claims One, Ten to Nineteen, and Twenty-One to Twenty-Three

The record reveals that Petitioner did not exhaust state remedies for Claims One,

Ten to Nineteen, and Twenty-One to Twenty-Three, because he did not present them to

the Delaware Supreme on direct appeal or post-conviction appeal. At this juncture, any

attempt by Petitioner to raise the Claims in a new Rule 61 motion in order to appeal any

adverse decision to the Delaware Supreme Court would be barred as untimely under

Delaware Superior Court Rule 61(i)(1) and as second or successive under Rule 61(i)(2).

See Del. Super. Ct. Crim. R. 61(i)(1) (establishing a one-year deadline for filing Rule 61

motions); Del. Super. Ct. Crim. R. 61(i)(2) (providing that second or successive motions

shall be summarily dismissed unless they meet the pleading requirements of Rule

61(d)(2)(i) or (ii)).  Although Rule 61(i)(1) provides for an exception to the one-year time limitation if the untimely Rule 61 motion "asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final," no such right is implicated in the instant argument.  Similarly, the exceptions to Rule 61(i)(1)'s time-bar and 61(i)(2)'s successive bar contained in Rule 61(i)(5) and (d)(2) do not apply to Petitioner's case, because he does not allege a credible claim of actual innocence, lack of jurisdiction, or that a new rule of constitutional law applies to the instant argument.  Given these circumstances, the Court must treat the arguments in Claims One, Ten to Nineteen, and Twenty-One to Twenty-Three as procedurally defaulted, meaning that the Court cannot review the merits of the Claims absent a showing of either cause and prejudice or that a miscarriage of justice will result absent such review.

Petitioner does not assert any cause for his failure to exhaust state remedies for Claims One, Ten, and Twenty-One to Twenty-Three.  In the absence of cause, the Court will not address the issue of prejudice.  Moreover, Petitioner has not satisfied the miscarriage of justice exception to the procedural default doctrine because he has not provided new reliable evidence of his actual innocence.  Accordingly, the Court will deny Claims One, Ten, and Twenty-One to Twenty-Three as procedurally barred.

Petitioner does, however, attempt to establish cause for his default of Claims Eleven to Nineteen, all of which allege that trial counsel provided ineffective assistance ("IATC").  Specifically, he explains that he presented Claims Eleven to Nineteen in his original *pro se* Rule 61 motion, but appointed post-conviction counsel refused to include these Claims in the amended Rule 61 motion that was presented to the Superior Court.

15

(D.I. 22 at 2) Post-conviction counsel also did not include Claims Eleven to Nineteen on post-conviction appeal.

It appears that Petitioner may be attempting to demonstrate cause for his default of Claims Eleven through Nineteen under *Martinez v. Ryan*, 566 U.S. 1 (2012). In *Martinez*, the Supreme Court held for the first time that inadequate assistance of counsel during an initial-review state collateral proceeding may establish cause for a petitioner's procedural default of a claim of ineffective assistance of trial counsel. *Id.* at 16-17. In order to obtain relief under *Martinez*, a petitioner must demonstrate that the state post-conviction attorney in his first state collateral proceeding was ineffective under the standards established in by *Strickland v. Washington*, 466 U.S. 668 (1984),[4] that the underlying IATC claim is substantial, and that petitioner was prejudiced. *Id.* at 9-10, 16-17. A "substantial" IATC claim is one that has "some merit" which, given the *Martinez* Court's citation to *Miller-El v. Cockrell*, 537 U.S. 322 (2003), appears to be governed by the standards applicable to certificates of appealability. *Id.* at 13-14.

The Third Circuit recently explained the application of *Martinez* in habeas cases:

> *Martinez* recognizes a narrow exception to the doctrine of procedural default: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." This exception is available to a petitioner who can show that: 1) his procedurally defaulted ineffective assistance of trial counsel claim has "some merit," and that 2) his state-post conviction counsel was "ineffective under the standards of *Strickland v. Washington*."

*Workman v. Sup't Albion SCI*, 915 F.3d 928, 937 (3d Cir. 2019). "To demonstrate that

---

[4]The Court discusses *Strickland*'s two-pronged standard (*i.e.*, performance and prejudice) in greater depth during its review of Claim Twenty. *See infra* at Section III.J

his claim has some merit, a petitioner must 'show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Id.* at 938 (quoting *Miller-El*, 537 U.S. at 336). To demonstrate that post-conviction counsel's ineffectiveness caused the procedural default, a petitioner must show that post-conviction counsel's performance was deficient under the first prong of the *Strickland* standard, *i.e.,* "that his state post-conviction counsel's performance fell below an objective standard of reasonableness." *Workman*, 915 F.3d at 941. For the following reasons, the Court finds that *Martinez* cannot excuse Petitioner's default because Petitioner has failed to demonstrate that the underlying IATC arguments in Claims Eleven through Nineteen have "some merit" and/or that he was prejudiced by trial counsel's alleged failures.

As an initial matter, although the Rule 61 affidavit trial counsel filed in Petitioner's Rule 61 proceeding does not specifically address the alleged errors raised in Claims Eleven through Nineteen,[5] the affidavit provides sufficient information for the Court to conclude that Petitioner cannot demonstrate that Claims Eleven through Nineteen have "some merit." Trial counsel's Rule 61 affidavit provides, in relevant part:

> **In evaluating trial strategy, counsel evaluates and assesses the strength of the State's case. The case against [Petitioner] was in effect extremely strong.** Counsel, in an attempt to weaken the State's case, filed several motions for severance and opposed the State's use of Mr. Curry's statement. These attempts failed at both the Superior Court and Supreme Court level.

---

[5]Trial counsel's Rule 61 affidavit does not address the alleged errors raised in Claims Eleven through Nineteen because Claims Eleven through Nineteen were not included in the amended Rule 61 motion filed by postconviction counsel.

17

> **Petitioner was charged with several murders, each having eyewitness testimony. [Petitioner] was apprehended after being seen leaving the crime area and found on foot with ammunition matching that used in the Eden Park murders. Additionally, Sure Shot Gang Members testified as to his Gang Participation.**

(D.I. 18-17 at 141) (emphasis added)

As explained by the Supreme Court, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).  The Court views trial counsel's determination that the State's case against Petitioner was "extremely strong" as supporting the presumption that trial counsel did not pursue the issues in Claims Eleven through Nineteen for tactical reasons.

The Court further notes that the state court record supports the presumption that trial counsel reasonably decided to not pursue the issues identified in Claims Eleven through Nineteen, and/or that Petitioner was not prejudiced by that failure.  For instance, in Claim Eleven, Petitioner contends that trial counsel should have requested a mistrial trial due to the fact that forensic pathologist Dr. Weedn testified about Palmer's autopsy, when Dr. Richard Callery was the forensic pathologist who actually conducted the autopsy.  The trial transcript demonstrates that: (1) Dr. Weedn testified because Dr. Callery was unavailable; (2) the State established Dr. Weedn's credentials to testify; and (3) trial counsel extensively questioned Dr. Weedn about essentially conducting an "autopsy from pictures" since Weedn did not actually perform the physical autopsy.  (D.I. 18-8 at 89-99)  Petitioner asserts that trial counsel should have called a "defense expert witness to refute Dr. Weedn's findings or discrepancies as to how autopsy was performed."  (D.I. 3-1 at 2)  "The selection of an expert witness is a

18

paradigmatic example of the type of strategic choic[e] that, when made after thorough investigation of [the] law and facts, is virtually unchallengeable." *Hinton v. Alabama*, 134 S.Ct. 1081, 1089 (2014). Petitioner does not explain how hiring an expert witness to review the autopsy report and testify would have been helpful, nor does he show that trial counsel's failure to call an expert witness to rebut Dr. Weedn's testimony fell below reasonable professional standards. Consequently, the IATC argument in Claim Eleven lacks "some merit."

In Claims Twelve and Thirteen, Petitioner alleges that trial counsel was ineffective for failing to request a mistrial based on the fact that Carl Rone lacked qualifying credentials to testify and by failing to move to strike Carl Rone's testimony on the basis that the diagram used during his testimony was confusing. Petitioner's co-defendant Jeffrey filed a motion *in limine* to exclude Carl Rone's expert testimony. *See State v. Phillips*, 2015 WL 5168253, at *1 (Del. Super. Ct. Sept. 2, 2015). On October 14, 2014, the Superior Court ruled from the bench that Rone "was qualified and that his methodology was correct." (D.I. 18-8 at 41) The Superior Court supplemented that ruling with a written opinion. *See.Phillips*, 2015 WL 5168253, at *1. The Superior Court explicitly found that Carl Rone "is qualified as an expert in firearms and toolmark identification under the requirements of [Delaware Rule of Evidence] 702." *Id.* at *3. In short, Petitioner's complaint does not demonstrate that trial counsel's failure to file a motion for mistrial with little chance of success fell below reasonable professional standards or that he was prejudiced by that failure. In other words, this IATC argument is not substantial.

Similarly, Petitioner's assertion that trial counsel should have moved to strike Rone's testimony regarding a diagram for being confusing fails to present a substantial IATC argument.  Before Rone testified before the jury, the State, trial counsel, and Jeffrey's counsel disagreed over the admissibility of the diagram because the Wilmington Police – not Rone – created the diagram based on Rone's descriptions. (D.I. 18-10 at 102-103, 108)  The Superior Court concluded that the diagram was admissible as demonstrative evidence but reserved a decision on whether the diagram would go back with the jury during deliberations.  (D.I. 18-10 at 108)  When Rone was referencing the diagram, Jeffrey's counsel objected to its admission for two reasons, one of which was that Rone appeared confused about its contents because he did not have first-hand knowledge of its contents.  More specifically, Jeffrey's counsel asserted: "this officer was totally confused as to the diagram, as if it's the first time he has seen it. And he couldn't even find items on it."  (D.I. 18-10 at 110)  The State responded that Rone's hesitancy was due to the small size of the diagram and inability to read it clearly. (*Id.*)  This record demonstrates that, although Jeffrey's counsel used the term "confusing" when he objected to Rone's testimony, the objection was not due to the confusing nature of Rone's testimony or the diagram but, rather, was due to the fact that Rone seemed confused when explaining the diagram.  Given these circumstances, Petitioner has not shown that trial counsel's failure to move to strike Rone's testimony for being "confusing" fell below reasonable professional standards or that he was prejudiced by that failure.  In other words, this IATC argument is not substantial.

Claim Fourteen asserts that trial counsel should have argued that the FBI examiner's testimony – that Petitioner's DNA was not found in hair samples taken from

the floor of the bathroom where Palmer was shot (D.I. 18-12 at 15-17) – raised a reasonable doubt that someone else was the shooter in the 2008 shooting of Palmer. Petitioner appears to contend that highlighting this issue would have shown that the State failed to prove beyond a reasonable doubt that Petitioner was an active participant in the 2008 charges. As recited by the Delaware Supreme Court in Petitioner's direct appeal, two witnesses identified Petitioner as participating in the Palmer shooting – Clayon Green and Curry. *See Phillips*, 154 A.3d at 1136, 1142. Given this eyewitness testimony, Petitioner cannot demonstrate a reasonable probability that, but for trial counsel's failure to highlight the FBI examiner's testimony, he would not have been convicted of charges related to the 2008 shooting. Thus, the IATC argument in Claim Fourteen lacks "some merit".

Claims Fifteen and Sixteen allege that trial counsel should have moved for the dismissal of Juror No. 5 on the ground that she could not remain impartial and should have had Petitioner in the courtroom when discussing Juror No. 5. The Superior Court received an anonymous note that Juror No. 5 admitted to discussing the case with her husband. (D.I. 18-12 at 117) The Superior Court *voir dired* all the jurors and asked each one if they had discussed the case with anyone. (*Id*. at 117-123) Juror No. 5 stated she did not have any discussions about the case with anyone, and alternate Juror No. 1 stated she had heard Juror No. 5 tell another juror that she (Juror No. 5) told her husband all about the case. (D.I. 18-12 at 120) The Superior Court called Juror No. 5 back and specifically asked if she had discussed the case with her husband. (*Id*. at 124-125) Juror No. 5 explained that she told her husband "like the basic stuff of the

outline of the case" prior to opening arguments. (*Id.* at 124-125)  After hearing from the

State and counsel for both Petitioner and Jeffrey, the Superior Court stated:

> I'm impressed that it wasn't an ongoing
> conversation.  It was before evidence had been
> heard.  So there was no discussion – I'm
> extrapolating – about guilt or innocence. So, for
> those reasons, I'll keep her on the jury.

(D.I. 18-12 at 126)  Given this record, Petitioner cannot demonstrate that trial counsel

acted in an objectively unreasonable manner by failing to request the dismissal of Juror

No. 5, nor can he demonstrate prejudice.  Thus, the instant IATC arguments are not

substantial.

In Claim Seventeen, Petitioner contends that trial counsel provided ineffective

assistance by not requesting the removal of Juror No. 10 after the juror wrote a note

asking to be removed from the jury.  (D.I. 18-13 at 25-39; D.I. 18-14 at 6)  After

clarifying that the note came directly from Juror 10 and not from the jury foreperson, trial

counsel and Jeffrey's counsel stated that they did not want the court to draw attention to

the note at all – not even through a jury instruction.  (D.I. 18-13 at 29-31)  The State

asked the court to instruct the jury that jurors cannot be substituted once deliberations

have begun.  (D.I. 18-13 at 31, 38-39)  The Superior Court decided not to talk to Juror

10 individually or to instruct the jury as a whole about the matter, and Juror No. 10

remained on the jury.  (D.I 18-13 at 39)  Petitioner has failed to indicate how he was

prejudiced by Juror 10's continued service.  For this reason, the Court concludes that

the IATC argument in Claim Seventeen is not substantial.

Claim Eighteen, which asserts that trial counsel should have requested a

colloquy concerning the prosecutor's display of emotion during the penalty phase, is not

22

substantial, because Petitioner was resentenced after his direct appeal. In other words, since he was resentenced, he cannot demonstrate how he was prejudiced by the prosecutor's show of emotion during the original penalty phase of his proceeding.

Claim Nineteen alleges that trial counsel ignored Petitioner's request to assert the defense of self-defense in the shooting of Hermon Curry. He contends that, during an unidentified interview, Christopher Spence admitted to taking Curry's gun out of his pocket and firing upon Petitioner. (D.I. 3-1 at 6) The Court has not found any reference in the record concerning an interview of Christopher Spence or any reference that someone used Curry's gun to shoot at Petitioner. Perhaps more importantly, however, is the fact that four eyewitnesses provided the following testimony describing what happened during Curry's shooting on July 8, 2012, and none of those accounts support Petitioner's assertion that someone used Curry's gun to shoot at him. For instance, Ricardo Brown testified that: (1) he did not see Curry with a gun at any point during July 8, 2012, the day of the shooting  (D.I. 18-10 at 128; (2) Petitioner shot Curry in the back, and continued to shoot Curry as Curry was running away (D.I. 18-9 at 143; D.I. 18-10 at 122-23, 125); and (3) he did not see anyone besides Petitioner and Jeffrey shooting that day, nor did he hear shots coming from anywhere else in the park that day (D.I. 18-10 at 128).

Raol Lacaille testified that: (1) Petitioner tapped Curry on his shoulder and, when Curry turned around, Petitioner started shooting at Curry (D.I. 18-11 at 71); and (2) Petitioner kept shooting Curry as Curry was running away (D.I. 18-11 at 73). During his testimony, Lacaille positively identified Petitioner as Curry's shooter. (D.I. 18-11 at 72)

Ceylon Brown testified that: (1) he saw Petitioner shooting Curry as Curry was running away (D.I. 18-11 at 90, 93); (2) he saw Christopher Spence shoot the driver of Petitioner's get-away car (D.I. 18-11 at 92); and (3) he saw Christopher Spence shoot at Jeffrey as Jeffrey was running off the field toward the get-away car (D.I. 18-11 at 92-93, 99-100). During his testimony, Brown positively identified Petitioner as the person who shot Curry. (D.I. 18-11 at 93)

Venus Cherry testified that: (1) he saw Spence sitting in a van in the parking lot when he (Cherry) was trying to park his car (D.I. 18-11 at 146); (2) Spence did not enter the field at all (D.I. 18-11 at 146); (3) he knew the people who were around him and Curry (D.I. 18-11 at 148); (4) he was down on one knee next to Curry and tying his shoes when Petitioner walked up to Curry, tapped him on the shoulder, and started shooting (D.I. 18-11 at 139, 146); and (5) Petitioner kept shooting as Curry ran away (D.I. 18-11 at 140). During his testimony, Cherry positively identified Petitioner as the person who shot Curry. (D.I. 18-11 at 140)

After viewing Petitioner's unsupported assertion that Christopher Spence initiated the incident by grabbing and using Curry's gun to shoot at Petitioner in conjunction with the aforementioned testimony, the Court concludes that Claim Nineteen lacks "some merit."

Based on the foregoing, the Court concludes that Petitioner has not established cause for his default of Claims Eleven through Nineteen. As a result, the Court will not address the issue of prejudice. Additionally, the miscarriage of justice exception does not excuse Petitioner's procedural default because he has not provided new reliable

evidence of his actual innocence.  Accordingly, the Court will deny Claims Eleven through Nineteen as procedurally barred.

### B. Claim Two

Prior to trial, Petitioner filed a motion to sever two charges of PDWBPP and the gang related charges, arguing joinder of the charges permitted the jury to hear evidence about the conduct of others that could be attributed to him and would otherwise be inadmissible.  The Superior Court denied the motion to sever charges.

Kelmar Allen was the State's primary witness against Petitioner and Jeffrey. Prior to Petitioner's trial, Allen pled guilty to gang participation.  During Petitioner's trial, Allen testified about his participation in the witness protection program.  After Allen mentioned the witness protection program, Petitioner moved to sever his case from Jeffrey's, arguing that he and Jeffrey sought to engage in different and antagonistic cross-examination strategies when addressing the witness protection issue.  The Superior Court denied the motion to sever cases.

On direct appeal, Petitioner argued that the Superior abused its discretion in denying both motions to sever, and that improper joinder of defendants deprived him of a fair trial.  (D.I. 18-14 at 69-77)  The Delaware Supreme Court rejected two of Petitioner's arguments, holding that: (1) the "Superior Court properly exercised its discretion when it denied [Petitioner's] motion to sever the defendants' trials"; and (2) the Superior Court did not abuse its discretion in denying Petitioner's motion to sever charges. *Phillips*, 154 A.3d at 1138-40.  The Delaware Supreme Court did not explicitly address Petitioner's argument that the Superior Court's denial of his motion to sever the cases deprived him of a fair trial.

In Claim Two of this proceeding, Petitioner contends (a) that the Superior Court abused its discretion when denying his motion to sever charges, and (b) that the denial of his motion to sever cases/defendants deprived him of a fair trial.  The State contends that Petitioner's failure to identify a specific constitutional right when presenting Claim Two indicates that he has only presented his misjoinder arguments as an issue of state law.

### 1.  Claim Two (a)

The record reveals that Petitioner presented his argument regarding the Superior Court's denial of his motion to sever charges ("Claim Two (a)") to the Delaware Supreme Court as an issue of state law. (*See* D.I. 18-14 at 74-77)  Petitioner's instant argument concerning the Superior Court's "abuse of discretion" in denying his motion to sever charges is an issue of state law.  Therefore, the Court will deny Claim Two (a) for failing to assert an issue cognizable on federal habeas review.

### 2.  Claim Two (b)

In contrast, when Petitioner presented Claim Two (b) to the Delaware Supreme Court on direct appeal, he argued that the misjoinder of defendants deprived him of his constitutional right to a fair trial. (*See* D.I. 18-14 at 69-74)  Claim Two (b) in this proceeding essentially replicates the same argument. (*See* D.I. 12 at 39-46)  Consequently, the Court views Claim Two (b) as alleging an error of federal law.

To reiterate, the State's witness Allen mentioned the witness protection program while he was testifying.  Petitioner's trial counsel immediately moved for a mistrial and, when that request was denied, he asked to sever the case/defendants. (D.I. 18-9 at 68-

69) The Superior Court's September 3, 2015 written supplemental decision denying the

severance motion provides the following background information:

> Trial counsel for [Petitioner's] position on the presentation of
> evidence of financial remuneration [] shows that [Petitioner] is
> a very dangerous individual if the State is willing to pay
> thousands of dollars to insure that Allen would testify against
> him, which is extremely detrimental to [Petitioner]. [...]  Trial
> counsel for [Petitioner] argued that this issue created
> antagonistic defenses between the Defendants because the
> difference in the Defendants' defense strategies on this issue
> was such that the jury could not accept one argument without
> rejecting the other.  [...]  Both trial counsels argued that this
> creation of antagonistic defenses by this is required
> severance of the defendants.  The State argued that the
> Defendants' opposing approaches on cross examination
> regarding the witness protection issue do not constitute
> antagonistic defenses under Delaware law to warrant
> severance.

(D.I. 18-14 at 183-84)  The Superior Court reviewed the parties' arguments under

Delaware Superior Court Criminal 8(b) and relevant Delaware caselaw, explaining:

> The decision to grant or deny a motion for severance is
> addressed to the sound discretion of the trial judge.  At the
> trial level, the defendant's burden to establish a need for
> severance is high because a separate trial will only be ordered
> upon a strong showing of prejudice.  Prejudice means more
> than just a better chance of acquittal at a separate trial.
> Incidental prejudice, such as that which is almost always
> encountered when multiple defendants are tried together, will
> not suffice.
>
> As a general rule, the factors to be considered when
> determining whether a motion for a separate trial should be
> granted are: problems involving a co-defendant's extra-
> judicial statements; and absence of substantial independent
> competent evidence of the movant's guilt; antagonistic
> defenses as between the co-defendant and the movant; and
> difficulty in segregating the State's evidence as between the
> co-defendant and the movant.
>
> When the basis for a defendant's motion is antagonistic
> defenses, the defendant is entitled to severance when the jury

> can reasonably accept the core of the defense offered by either defendant only if it rejects the core of the defense offered by his codefendant.  However, the presence of hostility between a defendant and his co-defendant or mere inconsistencies in defenses or trial strategies, does not require severance *per se*.

(D.I. 18-14 at 198-200)  The Superior Court then denied Petitioner's severance motion after determining that the co-defendants did not present antagonistic defenses, opining:

> In this case, both the Defendants argue that one defendant's decision to cross-examine the State's witnesses regarding their participation in witness protection would prejudice the other defendant, whose trial strategy was to  not address witness protection. However, neither of the Defendants' positions present separate defenses as to a State's witness's participation in witness protection, or otherwise, that the jury could only reasonably accept the core of [one defendant's defense] if it rejects the core of the defense offered by his co-defendant.  Moreover, neither of the Defendants testified or presented evidence that directly implicated the other in their own defense.

(D.I. 18-14 at 200-201)

The Delaware Supreme Court affirmed the Superior Court's decision, holding that Petitioner failed to demonstrate a "reasonable probability that substantial prejudice may have resulted from a joint trial" because: (1) Petitioner's differing position on cross-examination did not create a situation where he and his co-defendants were presenting antagonistic defenses; and (2) the "trial judge instructed the jury to weigh the evidence and apply the law individually to render separate verdicts as to each defendant." *Phillips*, 154 A.3d at 1138.  Since the Delaware Supreme Court did not adjudicate Petitioner's  "fair trial" argument, the Court will review the Delaware Supreme Court's decision *de novo*.

The Court's inquiry begins with determining the clearly established federal law

governing the instant issue. The Supreme Court has held that "[i]mproper joinder does

not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a

constitutional violation only if it results in prejudice so great as to deny a defendant his

Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8

(1986). Notably, the Supreme Court has not found a *constitutional* violation based on a

refusal to grant a severance request. In *Zafiro v. United States*, 506 U.S. 534 (1993),

the Supreme Court addressed a severance claim based on antagonistic defenses under

Federal Rules of Criminal Procedure 8 and 14, observing:

> There is a preference in the federal system for joint trials of
> defendants who are indicted together. Joint trials "play a vital
> role in the criminal justice system." They promote efficiency
> and "serve the interests of justice by avoiding the scandal and
> inequity of inconsistent verdicts." For these reasons, we
> repeatedly have approved of joint trials. But Rule 14
> recognizes that joinder, even when proper under Rule 8(b),
> may prejudice either a defendant or the Government.

506 U.S. at 537-38. The *Zafiro* Court opined: "We believe that, when defendants

properly have been joined under Rule 8(b), a district court should grant a severance

under Rule 14 only if there is a serious risk that a joint trial would compromise a specific

trial right of one of the defendants, or prevent the jury from making a reliable judgment

about guilt or innocence." *Id.* at 539. Importantly, the *Zafiro* Court noted that "[m]utually

antagonistic defenses are not prejudicial *per se*," and "it is well settled that defendants

are not entitled to severance merely because they may have a better chance of

acquittal in separate trials." *Id.* at 538, 540. Finally, the Third Circuit's following

explanation regarding the level of prejudice needed to determine whether a severance

denial under the Federal Rules of Criminal Procedure resulted in an unfair trial provides

guidance here: "[a] defendant *must pinpoint clear and substantial prejudice* resulting in an unfair trial"; "[i]t is not enough to show that severance would have increased the defendant's chances of acquittal." *United States v. McGlory*, 968 F.2d 309, 340 (3d Cir. 1992) (emphasis added).

In this proceeding, Petitioner contends that the joinder of his case with Jeffrey's violated his right to a fair trial because: (1) the evidence against him was "de minimis when compared to the evidence against his co-defendant," and the "jury was unable to compartmentalize the information against petitioner co-defendant" (D.I. 12 at 45); and (2) "without severance [Petitioner] was denied his constitutional rights [under *Bruton v. United States*, 391 U.S. 123-24 (1968)] to cross-examine his co-defendant about incriminating statements he made to the state's informant prior to trial, including statements relating to [P]etitioner being some type of gang leader" (D.I. 12 at 44). Neither of these contentions satisfy Petitioner's burden to "pinpoint clear and substantial prejudice" from the joinder of his trial with Jeffrey's. For instance, Petitioner's conclusory and speculative assertion regarding the jury's inability to compartmentalize information fails to rebut the presumption that the jury followed the Superior Court's instruction to weigh the evidence and apply the law separately to each individual codefendant. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) (noting that the "rule that juries are presumed to follow their instructions is a pragmatic one."). And, although Petitioner asserts that Jeffery made incriminating statements about Petitioner prior to trial, Petitioner does not assert that those alleged incriminating statements were introduced during the trial. Petitioner's speculative assertion of a possible *Bruton* violation does not satisfy his burden to demonstrate substantial prejudice.

In sum, consistent with the applicable standard set forth in *Zafiro*, the Delaware

Supreme Court explained that the "presence of hostility between a defendant and his

codefendant or mere inconsistencies in defenses or trial strategies" does not require

severance of defendants. *Phillips,* 154 A.3d at 1138. Although Jeffrey and Petitioner's

positions at trial differed, the jury was not required to reject Jeffrey's defense to accept

the defense of Petitioner. *See id.* Thus, Petitioner has not met his burden of

demonstrating that the joinder of defendants had an injurious and substantial effect in

determining the jury's verdict. Accordingly, the Court will deny Claim Two (b) as

meritless.

### C. Claim Three

In Claim Three, Petitioner contends that the admission of co-conspirator Seon

Phillips' statement relating to gang participants violated the Confrontation Clause. The

following summary provides information relevant to Claim Three.

> At trial, [Kelmar] Allen testified that he heard Seon and other
> Sure Shots members plan to retaliate for the shooting of
> Williams. Allen also testified that he overheard a phone
> conversation between [Petitioner] and Seon immediately after
> the Eden Park Homicides. Finally, Allen testified that he
> transported illegal drugs for Seon.

*Phillips*, 154 A.3d at 1141. On direct appeal, Petitioner argued that: (1) the admission of

Seon's statements under Delaware Rule of Evidence 801(d)(2)(E) violated the

Confrontation Clause because he was unable to cross-examine Seon; and (2) the

admission of the certified conviction of Mahary Goode for possession with intent to

deliver a Schedule II controlled substance and the admission of the certified conviction

of Jamel Chapman for possession with intent to deliver a Schedule I controlled

substance violated the Confrontation Clause because they were admitted without either individual testifying. *Id.* The Delaware Supreme Court denied both arguments as meritless. Therefore, Claim Three will only warrant relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The Confrontation Clause of the Sixth Amendment provides, in relevant part, that "in all criminal prosecutions, the accused shall enjoy the ... right to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, 541 US. 36 (2004), and its progeny, the United States Supreme Court held that the Confrontation Clause bars the admission of testimonial statements of witnesses absent from trial that are admitted to establish the truth of the matter asserted in the statement, unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *See Crawford*, 541 US. at 59, 60 n. 9; *see also Davis v. Washington*, 547 U.S. 813, 823-24 (2006). A testimonial statement is a statement that is made during non-emergency circumstances and which the declarant would objectively foresee might be used in the investigation or prosecution of a crime. *See United States v. Hinton*, 423 F.3d 355, 360 (3d Cir. 2005); *Davis*, 547 U.S. at 822. The threshold question in every Confrontation Clause case is whether the challenged statement is testimonial and, if so, whether it was introduced to establish the truth of the matter asserted. *See Hinton*, 423 F.3d at 357. If the statement is not testimonial in nature, then the Confrontation Clause has no application.

Here, the Delaware Supreme Court's denial of Petitioner's Confrontation Clause argument concerning the admission of Seon's statements was not contrary to clearly

established federal law, because the Delaware Supreme Court cited and applied *Crawford* in reaching its decision. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The Court must also determine if the Delaware Supreme Court's decision involved a reasonable application of *Crawford* and its progeny. When denying Petitioner's argument concerning Seon's statements, the Delaware Supreme Court found that: (1) Seon was a co-conspirator; (2) Seon's statements were either made in the course of the Sure Shots' pattern of criminal activity or made in furtherance of a conspiracy with Petitioner to perpetrate and flee from the Eden Park homicides; and (3) Seon and Petitioner were members of the conspiracy to retaliate for the shooting of Williams and Allen. *See Phillips*, 154 A.3d at 1141. The Delaware Supreme Court further explained that, pursuant to *Crawford*, "co-conspirator statements are not testimonial and do not implicate the Sixth Amendment." *Id*. After concluding that Seon's statements were not testimonial because they were made in furtherance of a conspiracy, the Delaware Supreme Court held that the "Superior Court properly concluded that [Petitioner's] Sixth Amendment rights were not violated." *Id.*

Given Petitioner's failure to provide clear and convincing evidence to the contrary, the Court accepts as correct the Delaware Supreme Court's factual determination that Petitioner and Seon were co-conspirators engaged in a conspiracy to retaliate the for the shooting of Williams and Allen. Therefore, the Court concludes that the Delaware Supreme Court reasonably applied *Crawford* and its progeny in affirming

the Superior Court's decision that the admission of Seon's statements did not violate Petitioner's rights under the Confrontation Clause.

## D. Claim Four

During Petitioner's trial, the State admitted the certified conviction of Mahary Goode for possession with intent to deliver a Schedule II controlled substance and the certified conviction of Jamel Chapman for possession with intent to deliver a Schedule I controlled substance "to establish that Sure Shots members have engaged in a pattern of criminal gang activity as required under 11 Del. C. § 616(b)." *Phillips*, 154 A.3d at 1141. On direct appeal, Petitioner argued that the admission of these convictions violated the Confrontation Clause because neither Goode nor Chapman testified at trial. *See id.* The Delaware Supreme Court declined to consider Petitioner's argument that the admission of the two certified records violated his confrontation rights because, "in finding [Petitioner] guilty of Gang Participation, the jury did not rely upon the convictions of either Goode or Chapman as evidence of the requisite 'pattern of criminal gang activity.'" *Id.* at 1142. After explaining that the jury only used the "murder of Curry and the Possession of a Firearm During the Commission of a Felony" ("PFDCF") as "evidence of the requisite 'pattern of criminal gang activity', the Delaware Supreme Court further concluded that "the admission of the evidence was harmless." *Id.*

A pattern of criminal gang activity is defined as the commission or attempted commission or solicitation of two or more enumerated offenses, included assault, murder, riot, drug offenses, or weapons offenses. *See* Del. C. § 616(a)(2). In order to prove the pattern of criminal activity element, the State had to provide evidence of two

or more of the enumerated crimes, committed individually or collectively by members of the street gang.

In Claim Four, Petitioner argues that his rights under the Confrontation Clause were violated when the Superior Court admitted the certified convictions of co-conspirators Mahary Goode and Jamel Chapman. The Delaware Supreme Court did not address whether the admission of the certified convictions violated the Confrontation Clause because it made the factual determination that the jury did not rely on those convictions when finding Petitioner guilty of gang participation.[6]  Nevertheless, the Court concludes that, even if the admission of the certified records of conviction violated the Confrontation Clause, Claim Four does not warrant relief.

On habeas review, a constitutional error is considered harmless unless it had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S 619, 623 (1993); *see Hassine v. Zimmerman*, 160 F.3d 941, 953 (3d Cir. 1998) (holding that the harmless error standard of *Brecht* applies on habeas review).  Under *Brecht*, a habeas court should grant relief when it is in grave doubt as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict.  *See O'Neal v. McAninch*, 513 U.S. 432, 436, 445 (1995) (habeas court should grant petition if it has "grave doubt" about whether "trial error of federal law had

---

[6] Petitioner has not provided clear and convincing evidence to rebut the presumption of correctness applicable to the Delaware Supreme Court's factual determination. Nonetheless, since the Court is unable to determine the reasonableness of the Delaware Supreme Court's factual decision on the record provided, and since the Court still reaches the same conclusion that Claim Four does not warrant relief, the Court finds it prudent to address Petitioner's Confrontation Clause argument.

substantial or injurious effect or influence in determining the jury's verdict."); *Hassine*,
160 F.3d at 955.

Here, given the overwhelming evidence of Petitioner's guilt of gang
participation—which includes, *inter alia*, Petitioner's convictions for Curry's murder and
PFDCF[7]—the Court is not left with "grave doubt" about whether admitting the certified
convictions of Goode and Chapman had a substantial and injurious effect or influence in
determining the jury's verdict.  Consequently, any error resulting from the admission of
the aforementioned certified convictions was harmless.  *See United States v. Lane*, 474
U.S. 438, 450 (1986) ("In the face of overwhelming evidence of guilt shown here, we are
satisfied that the claimed error was harmless.").  Accordingly, the Court will deny Claim
Four.

### E. Claim Five

State witness Clayon Green testified that he was "a hundred percent sure" he
"saw [Petitioner] and Jeffrey Phillips at Eden Park" involved in the shootings at the
soccer tournament on July 8, 2012. *Phillips*, 154 A.3d at 1143.  Green testified that he
did not inform police investigators on July 8, 2012 of everything he observed.  When
cross-examined and asked to explain his failure to be completely forthcoming at the
outset, Green indicated he was concerned about retaliation, and then stated, "If you
think I'm lying, ask [Petitioner] and what's his name if I'm lying." *Phillips*, 154 A.3d at
1143-44.  Both Petitioner and his co-defendant Jeffrey objected to Green's comment

---

[7]The State argued in its closing that Petitioner was guilty of gang participation—as
evidenced by, *inter alia*, the murders of Herman Curry and Christopher Palmer, the
assault on Antoine Harris, and the weapons charges accompanying those offenses (D.I.
18-12 at 150-237 )—and the evidence at trial supported that position.

and requested mistrials. The Superior Court denied the request and instructed the jury to "disregard the last answer given by the witness." *Id.* Petitioner appealed, arguing that the Superior Court erred in denying his request for a mistrial because Green's comment violated his Fifth Amendment right to remain silent and not testify, and the Superior Court's curative instruction did not remedy the situation. (D.I. 18-14 at 90-91) The Delaware Supreme Court considered this argument on direct appeal and denied it in a detailed opinion, determining that the Superior Court did not abuse its discretion by denying Petitioner's motion for mistrial after applying Delaware's four-factor analysis for determining whether an allegedly prejudicial remark by a witness requires a mistrial as set forth in *Revel v. State*, 956 A.2d 23, 27 (Del. 2008). *See Phillips*, 154 A.3d at 1144. More specifically, the Delaware Supreme Court held that the facts in Petitioner's case supported the conclusion that an isolated and accidental reference to Petitioner's right to remain silent did not warrant a mistrial. The Delaware Supreme Court also held that, to "the extent Green's comment prejudiced [Petitioner], that prejudice was effectively cured by the trial' court's immediate instruction" such that a mistrial was not warranted. *Id.*

In Claim Five, Petitioner reiterates his argument that the Superior Court erred by denying his motion for a mistrial because Green's comment violated his constitutional right to remain silent and not testify. The Court construes Claim Five as alleging that the Superior Court's failure to declare a mistrial violated his right to due process.

Pursuant to Supreme Court precedent, trial judges have broad discretion in deciding whether to grant a mistrial, and "may declare a mistrial whenever, in their opinion, taking all the circumstances into consideration, there is a 'manifest necessity'

for doing so, [] but the power ought to be with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Renico v. Lett*, 559 U.S. 766, 773-74 (2010).  There are no hard and fast rules regarding what conditions constitute a "manifest necessity" requiring a mistrial; rather, the determination must be based on the particular facts and circumstances of the case.  *See Russo v. Superior Ct. of New Jersey*, 483 F.2d 7, 13 (3d Cir. 1973); *Crawford v. Fenton*, 646 F.2d 810, 817 (3d Cir. 1981).

In Delaware, a trial judge's decision with respect to declaring a mistrial is reviewed for an abuse of discretion.  *See Revel*, 956 A.2d at  27.  In turn, a "mistrial is warranted only when there is a manifest necessity or the ends of justice would be otherwise defeated, and there are no meaningful and practical alternatives to that remedy."  *Dawson v. State*, 637 A.2d 57, 62 (Del. 1994).

Here, the Delaware Supreme Court applied Delaware's abuse of discretion standard when it reviewed the Superior Court's denial of Petitioner's motion for a mistrial.  *See Phillips*, 154 A.3d at 1144.  Since this standard mirrors the standard articulated in *Renico*, the Court concludes that the Delaware Supreme Court's decision was not contrary to clearly established federal law.  *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

As for the Court's inquiry under the "unreasonable application" prong of § 2254(d)(1), on habeas review

> [the] question is not whether the trial judge should have declared a mistrial.  It is not even whether it was abuse of

38

> discretion for her to have done so . . . The question under
> AEDPA instead is whether the determination of the [state
> court] that there was no abuse of discretion was an
> "unreasonable application of . . . clearly established law."

*Renico*, 559 U.S. at 772-72. An improper witness statement only rises to the level of a

due process violation if, when viewed in the context of the entire trial, the statement is of

sufficient significance so as to deny the petitioner of a fair trial because it prevented the

jury from arriving at a fair and impartial verdict. *See Greer v. Miller*, 483 U.S. 756, 765

(1987) (applied in the context of prosecutorial misconduct); *Arizona v. Washington*, 434

U.S. 497, 511-12 (1978). The Third Circuit has identified three factors a reviewing court

must consider when determining if a trial court abused its discretion in denying a

mistrial: (1) whether the witness' remarks were pronounced and persistent, creating a

likelihood of misleading and prejudicing the jury; (2) the strength of the other evidence;

and (3) the curative action taken by the court. *See United States v. Xavier*, 2 F.3d

1281, 1285 (3d Cir. 1993). Delaware trial courts consider similar factors when

determining whether a witness' statement has prejudiced the defendant such that a

mistrial is warranted: (1) the nature and frequency of the offending comment; (2)

whether the comment created a likelihood that the jury would be misled or prejudiced;

(3) the closeness of the case; and (4) the curative or mitigating action taken by the trial

judge. *See Revel,* 956 A.2d at 27; *Pena v. State*, 856 A.2d 548, 550-51 (Del. 2004).

After reviewing Green's statement to "go ask [Petitioner] if you think I'm lying"

within the aforementioned framework, the Court concludes that the Delaware Supreme

Court's decision does not warrant habeas relief. As an initial matter, given Petitioner's

failure to provide clear and convincing evidence to the contrary, the Court accepts as

correct the Delaware Supreme Court's implicit factual finding that Green's brief one-

sentence statement to "go ask" Petitioner was inadvertent in nature and made as part of an explanation for his failure to provide a full police statement earlier than he did. *See Phillips,* 154 A.3d at 1144. In turn, Green's extremely brief and inadvertent statement about Petitioner's exercise of his right to remain silent was unlikely to mislead the jury or result in substantial prejudice. Contrary to Petitioner's assertion, Green's comment did not directly implicate Petitioner's right to remain silent;[8] rather, Green testified that Petitioner and Jeffrey were at the park and reasonably stated that they could support the veracity of his testimony. Viewed in context, Green was neither challenging nor calling out Petitioner and Jeffrey to testify.

Further, the case was not close and the evidence against Petitioner was strong. For instance, in addition to Green, several witnesses testified to Petitioner's involvement in the Palmer, Curry, and Kamara homicides. The Superior Court's prompt, clear, and forceful curative instruction also adequately addressed trial counsel's concern about Green's statement without putting undue emphasis upon the subject, and the Delaware Supreme Court's determination that the trial judge's curative instruction was sufficient to cure any potential for prejudice resulting from Green's fleeting comment is consistent with Supreme Court precedent that juries are presumed to follow the instructions given by the trial court. *See Richardson*, 481 U.S. at 206-07 (collecting cases where the Supreme Court has presumed that a jury would follow its instructions to disregard evidence or use evidence for a limited purpose).

---

[8]A defendant's Fifth Amendment right to be free from self-incrimination has been violated where "the language was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Brennan,* 326 F.3d 176, 187 (3d Cir.2003).

In short, after reviewing Petitioner's allegation in context with the aforementioned circumstances, the Court concludes that the Delaware Supreme Court's decision that the Superior Court did not abuse its discretion in denying Petitioner's motion for a mistrial was neither contrary to, nor an unreasonable application of, clearly established federal law. Petitioner has failed to show that the Delaware Supreme Court's decision was so fundamentally unfair that he was denied due process. Accordingly, the Court will deny Claim Five for failing to satisfy § 2254(d).

## F. Claim Six

In Claim Six, Petitioner contends that "the imposition of the death penalty in this case fails a proportionality review. Also, the imposition of the death penalty under 11 Del. C. § 429(c)(d) is unconstitutional." (D.I. 3 at 14) On direct appeal, the Delaware Supreme Court acknowledged that Delaware's death penalty statute is unconstitutional, vacated Petitioner's sentence, and remanded the case to the Superior Court for resentencing. See Phillips, 154 A.3d at 1135. The Superior Court resentenced Petitioner to life imprisonment. Since Petitioner has obtained the relief requested, the Court will dismiss Claim Six as moot.

## G. Claim Seven

Herman Curry witnessed the murder of Christopher Palmer on January 27, 2008. He provided a statement about the shooting to the police and identified Petitioner in a photo lineup as Palmer's shooter. During Petitioner's trial, the State filed a motion in limine to permit the admission of Curry's prior out-of-court statement identifying Petitioner as Palmer's shooter under the "forfeiture by wrongdoing" exception to the rule against hearsay. (D.I. 18-14 at 245-254) The State sought to admit Curry's statement

41

as evidence of Palmer's murder and as evidence of the motive for Curry's murder. The Superior Court granted the motion to admit the statement as admissible hearsay under Delaware Rule of Evidence 804(b)(6) based on Petitioner's forfeiture by wrongdoing, but "reserve[d] the right to revisit [the] decision based upon the testimony presented at trial as well as other hearings in this case." *Phillips*, 154 A.3d at 1142.

Petitioner appealed, arguing that the Superior Court abused its discretion in admitting Curry's prior statement because: (1) there was insufficient evidence to permit the statement; (2) the statement was more prejudicial than probative; and (3) the statement was not needed for the Eden Park murders. The Delaware Supreme Court held that the Superior Court did not abuse its discretion in admitting Curry's statement under the "forfeiture by wrongdoing" exception to the hearsay rule. *See Phillips*, 154 A.3d at 1143.

In Claim Seven, Petitioner contends that the Superior Court abused its discretion in admitting Curry's statement under the "forfeiture by wrongdoing" exception to the hearsay rule codified at Delaware Rule of Evidence 804(b)(6). To the extent Petitioner challenges the admission of Curry's statement under the Delaware Rules of Evidence, he has alleged a violation of state law that is not cognizable on federal habeas review.

Nevertheless, since the "forfeiture of wrongdoing" doctrine "extinguishes confrontation claims on essentially equitable grounds," *Davis*, 547 U.S. at 833, the Court recognizes that Petitioner may be attempting to argue that the Superior Court's admission of Curry's statement violated his rights under the Confrontation Clause. The Court also notes that claims alleging errors in state evidentiary rulings are reviewable in habeas corpus if the evidentiary rulings rise to the level of a due process violation. *See*

*Estelle v. McGuire*, 502 U.S. 62, 67-8 (1991); *see also Biscaccia v. Att'y Gen. of Sate of N.J*, 623 F.2d 307, 312 (3d Cir. 1980) (reiterating that "evidentiary errors of state courts are not considered to be of constitutional proportion, cognizable in federal habeas proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial."). Thus, to the extent Petitioner is alleging that the admission of Curry's statement violated his confrontation rights and/or his due process rights, his arguments are reviewable in habeas.

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to confront the witnesses against him. *See Davis*, 415 U.S. at 315. As previously discussed, pursuant to *Crawford v. Washington*, out-of-court statements that are testimonial in nature are barred by the Confrontation Clause of the Sixth Amendment if the declarant is unavailable at trial and the defendant did not have a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable. *See supra* at Section III.C. Nevertheless, the "rule of forfeiture by wrongdoing . . . extinguishes confrontation grounds on essentially equitable grounds," such that a defendant who "obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, 547 U.S. at 833. The Supreme Court has clarified that the "forfeiture by wrongdoing" doctrine is applicable only when there is a showing that the defendant intended to prevent a witness from testifying. *See Giles v. California*, 554 U.S. 353, 361 (2008). Notably, the "forfeiture by wrongdoing" doctrine is both an exception to the Confrontation Clause and an exception to the rule against hearsay. *See Davis*, 547 U.S. at 833 (observing the doctrine has been codified as a hearsay exception in Federal Rule of Evidence 804(b)(6)).

The Delaware Supreme Court denied relief for Claim Seven after finding that Curry's statement was properly admitted under the "forfeiture by wrongdoing" exception to the rule against hearsay.  In reaching this conclusion, the Delaware Supreme Court cited *Davis*, *Crawford*, and *Giles*, and explained that the doctrine of "forfeiture by wrongdoing" "has been recognized by the United States Supreme Court and codified in both the Federal Rules of Evidence" and Delaware Rule of Evidence 804(b)(6).[9]  The Delaware Supreme Court also identified the following three-pronged test used by federal courts to assess the admissibility of statements under the forfeiture by wrongdoing exception, which requires the government to show: (1) that the defendant engaged or acquiesced in wrongdoing (2) that the wrongdoing was intended to procure the declarant's unavailability, and (3) that the wrongdoing did procure the unavailability." *Phillips,* 154 A.3d at 1143.

The Delaware Supreme Court determined that the Superior Court properly applied this framework to Petitioner's case, where Petitioner was charged with killing a witness -- Curry -- to prevent him from testifying, explaining that:

> The Superior Court concluded that [Petitioner] killed Curry that [Petitioner] was aware that Curry was witness who would be able to testify about Palmer's shooting, and that when [Petitioner] shot Curry he was motivated at least in part by a desire to silence Curry as a witness to Palmer's murder.  The trial judge did not abuse his discretion in finding that [Petitioner] engaged in wrongdoing which resulted in Curry's unavailability.

*Id.*

---

[9]Delaware Rule of Evidence 804(b)(6) "permits the court to admit a statement offered against a party when that party has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." *Miller v. State*, 270 A.3d 259, 271 (Del. 2022).

Given Petitioner's failure to provide clear and convincing evidence to the contrary, the Court accepts as correct the Delaware state courts' factual determination that Petitioner acted with the requisite intent to prevent Curry from testifying. The Court also notes that the record supports this factual finding.[10] As a result, the Court concludes that the Delaware Supreme Court's decision is neither contrary to, nor an unreasonable application of, *Crawford* and its progeny, nor is it based on an unreasonable determination of the facts. In addition, since Curry was unable to testify at trial due to Petitioner's wrongful conduct, Petitioner has failed to demonstrate that the admission of Curry's prior out-of-court statement concerning Palmer's murder violated his right to due process. Accordingly, the Court will deny Claim Seven for failing to satisfy § 2254(d).

## H. Claim Eight

In Claim Eight, Petitioner contends that the Superior Court judge's "answer to jury question was overly suggestive." (D.I. 3 at 17) The Court liberally construes this

---

[10]The State sought a ruling *in limine* permitting the admission of Curry's prior out-of-court statement under the forfeiture by wrongdoing exception as evidence of the 2008 murder of Christopher Palmer and as motive for Curry's death. (D.I. 18-14 at 245-254) The Superior Court considered testimony presented in an August 19, 2013 proof positive hearing (D.I. 18-15 at 201-203), the State's motion *in limine* seeking to admit Curry's statement under the forfeiture by wrongdoing exception to the hearsay rule, and Petitioner's opposition. (D.I. 18-14 at 263, 268-69) These items revealed the following facts. On January 27, 2008 Curry witnessed the murder of Christopher Palmer at a party in Wilmington after Palmer had turned a group of men away from the party. Curry knew the men were members of the Sure Shots gang and identified Petitioner in a photo lineup a Palmer's shooter. On July 8, 2012, Petitioner located Curry at a soccer tournament in Eden Park, headed directly toward Curry, and shot him multiple times in the chest. Jeffrey was with Petitioner at Eden Park. Jeffrey revealed a conversation he had with Petitioner to another witness where Petitioner told Jeffrey that Curry "needed to be taken care of" because Curry was "trying to take [Petitioner] down for murder." (D.I. 18-14 at 246-251)

Claim as asserting that the trial judge engaged in jury coercion.  The following excerpt

from the Delaware Supreme Court's appellate decision provides pertinent background

information for Petitioner's instant allegation.

> During jury deliberations, the trial judge received two notes.
> The first advised that a juror sought to be removed from the
> jury.  The second, which immediately followed the first, read:
>
>> We are not able to productively discuss the case
>> due to the fact that one juror claims to not have
>> collected any of the evidence presented from
>> day one.  She was told not to form an opinion
>> from the start, and has interpreted that to mean
>> that she should not be taking in information,
>> putting it in perspective, and apply productive
>> reasoning to determine whether the events
>> occurred as the State's [sic] presents.  She is
>> upsetting all of the other jurors.
>
> [Petitioner]  initially suggested the trial judge respond to both
> notes by rereading the court's instruction on how a jury
> conducts its deliberations and adding that "they are the 12 that
> have to decide the case, there cannot be a substitution."
> Jeffrey did not want the trial judge to reread the note to the
> jury as part of the court's instruction, and [Petitioner] agreed.
> Jeffrey objected to the portion of the trial judge's proposed
> instruction which stated:  "Delaware law does not permit the
> substitution of any juror once deliberations begin." On this
> point, [Petitioner] remained silent.  The court noted Jeffrey's
> objection and instructed the jury:
>
>> Good morning, ladies and gentlemen.    In
>> response to the note I received, please refer to
>> the jury instructions on how to conduct jury
>> deliberations. Delaware law does not permit the
>> substitution of any juror once deliberations
>> begin.  Thank you.  Would you please go back
>> into the jury room.

*Phillips*, 154 A.3d at 1144.

On direct appeal, Petitioner acknowledged that that the Superior Court's instruction was a correct statement of Delaware law, "but argued that the instruction was coercive because it was not accompanied by the admonition that 'individual jurors should not surrender their convictions.'" *Phillips*, 154 A.3d at 1145. The Delaware Supreme Court rejected the argument after applying Delaware precedent – *Streitfeld v. State,* 369 A.2d 674 (Del. 1977) – concluding that the jury instruction at issue "did not suggest to any juror that a particular course of action should be undertaken for the mere sake of reaching a verdict." *Phillips,* 154 A.3d at 1145.

To the extent Petitioner's instant challenge to the jury instruction is based on Delaware law, he has asserted an error of state law that does not present an issue that is cognizable on federal habeas review. *See Estelle*, 502 U.S. at 67.

To the extent Petitioner challenges the jury instruction based on federal law, his argument is procedurally barred because he has not satisfied the "fair presentation" requirement of the exhaustion doctrine. The record reveals that Petitioner presented his "coercive jury instruction" argument in Claim Eight to the Delaware Supreme Court on direct appeal purely as an error of Delaware law and not as a violation of his federal constitutional rights.[11] (*See* D.I. 18-14 at 107) While Petitioner's failure to frame his argument with the explicit reference to the United States Constitution or constitutional rights is not necessarily determinative of this inquiry, Petitioner did not reference any federal constitutional principle or law, refer to any case interpreting federal constitutional

---

[11]For instance, Petitioner cited only one case, *Brown v. State*, 369 A.3d 682 (Del. 1976) as support for his argument in his opening appellate brief. (D.I. 18-14 at 107)

law, or present his argument in terms bringing to mind a violation of due process. The fact that the Delaware Supreme Court also viewed Petitioner's argument as alleging a violation of Delaware law provides additional support for the Court's conclusion that Petitioner did not "fairly present" a federal constitutional issue on direct appeal.

At this point in time, Petitioner cannot return to the Delaware state courts in an effort to seek further relief because any attempt to file a new Rule 61 motion would be denied as time-barred under Rule 61(i)(1), successive under Rule 61(i)(2), and defaulted under Rule 61(i)(3). *See* Del. Super. Ct. Crim. R. 61(1), (2), (3). Therefore, any federal basis for Claim Eight is procedurally defaulted, meaning that the Court cannot review the Claim's merits absent a showing of cause and prejudice, or that fundamental miscarriage of justice will result absent such review.

Petitioner does not assert any cause for his default of Claim Eight. In the absence of cause, the Court will not address the issue of prejudice. Additionally, Petitioner has not satisfied the miscarriage of justice exception to the procedural default doctrine because he has not provided new reliable evidence of his actual innocence. Accordingly, to the extent it is cognizable, the Court will deny Claim Eight as procedurally barred.

## I. Claim Nine

Petitioner was arrested on July 8, 2012, and indicted on capital murder charges 106 days later, on October 22, 2012. Petitioner filed a motion to dismiss for failure to prosecute on November 16, 2012. (D.I. 18-15 at 206-208) Petitioner was reindicted on February 18, 2013, which was 225 days after Petitioner's arrest and 129 days after his original indictment. The reindictment added six new co-defendants and thirty new

48

charges; Petitioner was charged with the original fourteen counts and one new count of

second-degree conspiracy.  (D.I. 18-15 at 211-239)  On March 18, 2013, Petitioner filed

a second motion to dismiss the charges based on a delay in the reindictment.  (D.I. 18-

14 at 236-238)  In the motion to dismiss, Petitioner asserted that his "speedy trial rights

are and have been violated, [and Petitioner] prays for the charges to be dismissed for

failure to prosecute.  To the extent not previously raised, [Petitioner] demands a speedy

trial."  (D.I. 18-14 at 237)  Petitioner also asserted "that the delay in prosecution was

intended to harass or gain tactical advantage, violating due process."  (*Id*. at 238)  In its

response, the State noted that the

> thrust of [Petitioner's] motion is premised on Superior Court
> Criminal Rule  48(b) although [he] failed to cite it in his motion.
> Rule 48(b) provides for dismissal:
>
> > (b) By Court.  If there is unnecessary delay in
> > presenting the charge to a grand jury or … if
> > there is unnecessary delay in bringing a
> > defendant to trial, the court may dismiss the
> > indictment, information or complaint.
>
> The Delaware Supreme Court, in *Fischer* and its progeny,
> made it a requirement that the "unnecessary delay"
> mentioned in the statute must result in prejudice to the
> defendant that is attributable to the State.  *State v. McElroy*,
> 561 A.2d 154, 157 (Del. 1989); *State v. Fischer*, 285 A.2d 417
> (Del. 1971).   The Supreme Court has emphasized that
> dismissal is warranted where the delay is due to "conscious
> prosecution choice which gives the impression, perhaps
> unwarranted, of unfair manipulation."  *Fischer* at 419.

(D.I. 18-14 at 240-41)  Petitioner filed a reply to the State's answer, citing cases dealing

with the standard for dismissing an indictment for undue delay under Delaware Superior

Court Criminal 48(b), which sets forth Delaware's standard for dismissing an indictment

for failure to prosecute. (D.I. 18-14 at 242-43, citing *State v. Willis*, 2001 WL 789667 (Del. Super. Ct. Apr. 24, 2001) and *State v. Harris*, 616 A.2d 288 (1992))

The Superior Court denied Petitioner's second motion to dismiss on August 20, 2013, after determining that any delay in issuing the reindictment was not of sufficient length to be substantial. *See Phillips*, 154 A.2d at 1146.

Petitioner appealed his convictions and sentences. His opening appellate brief contained an argument titled "Delay in Trial for Murder of Herman Curry and Alexander Kumara was Prejudicial." (D.I. 18-14 at 108) Although the title of the argument indicated that Petitioner was challenging a delay in his trial, the focus of his argument was the delay between his arrest and reindictment. (D.I. 18-14 at 236-238) Petitioner conceded that there was no delay with respect to the original indictment and, instead, contended that "the issue of delay comes into play with the re-indictment dated February 18, 2013, which is 225 days from the date of arrest." (*Id*. at 110) Petitioner also mentioned the right to a speedy trial, and correctly identified the Supreme Court test – *Barker v. Wingo*, 407 U.S. 514 (1972) – for determining whether a defendant's speedy trial rights were violated. Yet, both his argument and case citations indicated that Petitioner was arguing that the Superior Court erred by not dismissing his reindictment due to unnecessary delay. (D.I. 18-14 at 109, citing *State v. Fischer*, 285 A.2d 417 (Del. 1971)) In its Answer, the State noted the inconsistencies in Petitioner's arguments, stating: "While the title of his argument suggests that he was prejudiced by a delay in his trial, [Petitioner] appears to argue that the Superior Court should have dismissed the case for a delay in a reindictment. [Petitioner's] argument confuses the procedural history of the case and lacks merit." (D.I. 18-16 at 59) The State proceeded

to analyze Petitioner's challenge to the Superior Court's denial of his motion to dismiss under the *Barker* standard applied to speedy trial claims. (*Id.* at 59-61)  On direct appeal, the Delaware Supreme Court rejected Petitioner's argument and held that the "Superior Court properly concluded that there was no violation of [Petitioner's] right to a speedy trial." *Phillips*, 154 A.3d at 1146.

In Claim Nine of this proceeding, Petitioner asserts that the "Delay in Trial for Murder of Herman Curry and Alexander Kumara was Prejudicial."  It appears that Petitioner has merely re-asserted the "title" used for the speedy trial claim in his state appellate brief as the substance of his instant argument.  Given these circumstances, the Court liberally construes Claim Nine as asserting the same arguments presented in Petitioner's direct appeal, namely:  (1) the Superior Court erred by failing to dismiss the reindictment for undue delay under Delaware Superior Court Criminal Rule 48(b); and (2) the Superior Court erred in denying his motion to dismiss because the delay in reindictment violated his Sixth Amendment right to a speedy trial.

To the extent Petitioner argues that the Delaware state courts misapplied Rule 48(b) when refusing to dismiss his reindictment for undue delay, he is alleging an error of state law that is not cognizable in this proceeding.  Therefore, the Court will dismiss Petitioner's Rule 48(b) argument for failing to assert a proper basis for habeas relief.

To the extent Petitioner argues that the State's delay in issuing the reindictment violated his Sixth Amendment right to a speedy trial, he has presented an issue that is cognizable on federal habeas review that was denied on the merits in his direct appeal. *See Phillips*, 154 A.3d at 1146.  On direct appeal, the Delaware Supreme Court held that "the Superior Court properly concluded that there was no violation of [Petitioner's]

51

right to a speedy trial." *Phillips*, 154 A.3d at 1146.  Thus, the Court will review Claim Nine's speedy trial claim under the deferential standard contained in § 2254(d).

The Sixth Amendment guarantees the right to a speedy trial. *See* U.S. Const. amend. VI. The clearly established Supreme Court precedent governing speedy trial claims is set forth in *Barker v. Wingo,* 407 U.S. 514, 530 (1972). According to *Barker,* courts must consider four factors when determining if a defendant's speedy trial rights were violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Id.* The Supreme Court has explained that "[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* Delays of one year or more trigger the analysis into the other *Barker* factors. *See Doggett v. United States,* 505 U.S. 647, 652 n. 1 (1992).

Turning to the first prong of the § 2254(d)(1) inquiry, the Court notes that the Delaware Supreme Court correctly identified the *Barker* test as governing Petitioner's speedy trial argument. *See Phillips,* 154 A.3d at 1145. As a result, the Delaware Supreme Court's decision was not contrary to clearly established federal law.

The Court must also determine if the Delaware Supreme Court reasonably applied *Barker* in concluding that the delay in reindictment did not result in a violation of Petitioner's right to a speedy trial. While the Delaware Supreme Court did not explicitly balance each *Barker* factor when deciding Petitioner's appeal, that failure does not on

its own, demonstrate that it unreasonably applied *Barker*.[12]  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.  To assess whether Petitioner has made this showing, the Court must determine "what arguments or theories ... could have supported[ ] the state court's decision" and then ask whether fairminded jurists could conclude that those arguments and theories are consistent with the Supreme Court's relevant teachings.  *Id*. at 786.  If there is any objectively reasonable basis on which the state court could have denied relief, AEDPA demands that the Court respect its decision to do so.  With these principles in mind, the Court turns to its analysis of *Barker*'s four-factor balancing test.

### 1. First *Barker* Factor: Length of Delay

Under *Barker*'s first factor, the Court must make a threshold determination concerning the length of the delay.  The Delaware Supreme Court viewed the relevant time period for determining the length of the delay to be the time between the original indictment and the reindictment and, therefore, concluded that the 129-day delay was "not of sufficient length to be prejudicial." *Phillips*, 154 A.2d at 1146.  In the speedy trial context, the length of the delay "is measured from the date of formal accusation, *i.e.*,

---

[12]The *Barker* Court itself clarified,

> [w]e regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant.  In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.

*Barker*, 407 U.S. at 533.

from the earliest date of arrest or indictment until the commencement of trial." *Hakeem v. Beyer*, 990 F.2d 750, 760 (3d Cir. 1993); *see United States v. MacDonald,* 456 U.S. 1, 7 (1982) (explaining "[i]n addition to the period after indictment, the period between arrest and indictment must be considered in evaluating a Speedy Trial Clause claim."). Here, two years and three months passed between Petitioner's arrest (July 8, 2012) and the start of his trial (October 9, 2014).  Since this delay is greater than one year it is presumptively prejudicial[13] and triggers the Court's duty to consider the remaining *Barker* factors.[14]

## 2. Second Barker Factor: Reason for the Delay

With respect to the second *Barker* factor, the State "bears the burden to justify the delay." *Hakeem*, 990 F.2d at 770.  The Supreme Court has explained that the central inquiry with respect to factor two is "whether the government or the criminal defendant is more to blame for the delay." *Doggett*, 505 U.S. at 651.  "[D]ifferent weights should be assigned to different reasons." *Barker*, 407 U.S. at 531.  Some reasons for delaying a trial are improper, *e.g.*, harassment,[15] and improper reasons are "weighted heavily against the government." *Id*.  Some reasons for delaying a defendant's trial are neutral, *e.g.*, an understaffed prosecutor's office. *See Strunk v. United States*, 412 U.S. 434, 436 (1973).  Although labeled neutral, "the ultimate responsibility for such circumstances must rest with the government rather than with the

---

[13]*See Doggett*, 505 U.S. at 652 n.1.

[14]The Court notes that, although the Delaware Supreme Court did not view the length of the delay to be prejudicial, the Delaware Supreme Court still proceeded to review the second and fourth *Barker* factors.  *See Phillips*, 154 A.3d at 1145-46.

[15] *See United States v. Marion*, 404 U.S. 307, 325 (1971).

defendant." *Barker*, 407 U.S. at 531. Finally, some reasons for delaying a trial are valid, *e.g.*, a missing witness, and valid reasons are weighted in favor of the government. *See id.* Longer delays can be tolerated when the crime is very serious or complex. *See Barker,* 407 U.S. at 531 ("To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.").

On direct appeal, Petitioner argued that the State deliberately delayed its "murder prosecution so unrelated charges could be added to the indictment." (D.I. 18-14 at 109) Petitioner focused on the 225 day delay from the date of arrest (July 8, 2012) to the date of the reindictment (February 18, 2013), arguing that "the State delayed a murder prosecution so unrelated charges could be added to the indictment." (D.I. 18-14 at 109) Notably, Petitioner does not object to the time between his arrest and the original indictment, and he does not object to the time between the reindictment and his trial. In fact, on May 14, 2013, approximately three months after the reindictment, the trial judge complied with Delaware Supreme Court Administrative Directive 121 and notified the Chief Justice that Petitioner's case was scheduled to take place more than one year after indictment. (D.I. 18-1 at 4, Entry No. 19); *see State v. Jones*, 2008 WL 4173816, at *10 n.72 (Del. Super. Ct. Sept. 3, 2008) (setting forth the text of Administrative Directive 121). The trial judge simultaneously issued a detailed and complex scheduling order setting trial to begin on October 20, 2014. (D.I. 18-1 at 4-5, Entry No. 20) Both Parties complied with the scheduling order, and Petitioner's trial actually started on October 9, 2014.

Under normal circumstances, the Court would consider the period of delay from arrest to trial when evaluating a Sixth Amendment speedy trial claim. *See United States v. Battis*, 589 F.3d 673, 679 & n.5 (3d Cir. 2009) (calculating delay as the period "between the [first] federal indictment … and the start of trial," and holding "that the speedy trial right was not affected by the filing of a superseding indictment"). Here, however, given both Parties' compliance with the scheduling order deadlines, the Court views the relevant time-period under the second *Barker* factor to be the 225 days between Petitioner's arrest and reindictment. And given Petitioner's concession that there is no speedy trial issue with respect to the time between his arrest and original indictment, the Court will focus on the State's reasons for the 129-day period between the original indictment and reindictment.

The State provided the following explanation for the delay when it responded to Petitioner's speedy trial motion: "the Eden Park murders sparked a broader and more complex investigation tying the murders to the Sure Shots gang and their criminal enterprise. The reindictment was a result of that expanded investigation which […] was directly related to the Eden Park murders." (D.I. 18-16 at 60) The State's explanation for the delay in issuing the reindictment is supported by the record. The original indictment contained 24 counts and, *inter alia*, charged ten defendants (including Petitioner) a with a complex gang participation charge involving the Sure Shots gang. (D.I. 21-1 at 43-56) The reindictment contained 54 counts and, *inter alia*, charged 16 defendants (still including Petitioner) with the same complex gang participation charge involving the Sure Shots gang. (D.I. 21-1 at 57-85) Given the validity of the State's reasons, and the absence of any showing that the 129 day delay between the original

indictment and reindictment was the result of bad faith by the State, the Court concludes that the second *Barker* factor weighs only slightly in Petitioner's favor.

### 3. Third *Barker* Factor: Assertion of Speedy Trial Right

The third factor addresses the timeliness and frequency of the defendant's assertion of his speedy trial rights. Here, Petitioner filed a motion to dismiss on speedy trial grounds on March 18, 2013, one month after he was a reindicted. The Court concludes that the third factor weighs in Petitioner's favor.

### 4. Fourth *Barker* Factor: Prejudice

*Barker*'s fourth factor of prejudice should be assessed in light of the following three interests: (1) preventing oppressive pre-trial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired by dimming memories and the loss of exculpatory evidence. *See Barker,* 407 U.S. at 532. The most serious form of prejudice is the impairment of the accused's defense. *See Doggett,* 505 U.S. at 654.

On direct appeal, Petitioner argued that "the prejudice to [him] cannot be measured merely by time. The prejudice lies in allowing the State additional time to develop evidence of other crimes." (D.I. 18-14 at 111) Petitioner's argument does not identify the forms of prejudice normally considered in a speedy trial analysis. For instance, Petitioner did not assert that the delay resulted in the loss of witnesses or evidence or otherwise impaired his ability to present a defense. Since the original indictment already charged Petitioner with capital murder, it does not appear—and the record does not suggest—that the addition of charges in the reindictment lengthened his pre-trial incarceration or caused additional anxiety and concern. Consequently, the

Court concludes that *Barker*'s fourth factor of prejudice does not weigh in Petitioner's favor.

In summary, the first and third *Barker* factors weigh in Petitioners' favor, the second factor weighs slightly in Petitioner's favor, and the fourth factor weighs in favor of the State. After viewing these mixed *Barker* results under AEDPA's deferential standard, the Court concludes that the Delaware Supreme Court did not unreasonably apply clearly established federal law when denying Petitioner's speedy trial claim. *See, e.g., Goodrum v. Quarterman*, 547 F.3d 249 (5th Cir. 2008) (relief denied where the first and third factors weighed heavily in petitioner's favor, the second factor weighed slightly in his favor, and the fourth factor weighed in the state's favor); *see also Amos v. Thornton,* 646 F.3d 199 (5th Cir. 2011) (relief denied where the first and second factors weighed slightly in petitioner's favor, the third factor weighed strongly in his favor, and the fourth factor weighed in the state's favor).

### J. Claim Twenty

In Claim Twenty, Petitioner contends that trial counsel provided ineffective assistance by failing to request a mistrial after learning during jury deliberations that one of the jurors had not collected or taken in any evidence presented during trial. (D.I. 3 at 23) Petitioner presented Claim Twenty to the Delaware Supreme Court on post-conviction appeal, which denied the Claim as meritless. Given these circumstances, habeas relief will only be available if the Delaware Supreme Court's decision was either contrary to, or involved an unreasonable application of, clearly established federal law.

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v.*

*Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's error the result would have been different." *Id.* at 687-96. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 688.

In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689.

Turning to the first prong of the § 2254(d)(1) inquiry, the Court notes that the Delaware Supreme Court correctly identified the *Strickland* standard as governing Petitioner's instant ineffective assistance of counsel contention. *See Phillips*, 2020 WL 4196649, at *3-4. As a result, the Delaware Supreme Court's decision was not contrary to clearly established federal law.

The Court must also determine if the Delaware Supreme Court reasonably applied the *Strickland* standard to the facts of Petitioner's case. *See Harrington*, 562 U.S. at 105-06. When performing this inquiry, the Court must review the Delaware Supreme Court's denial of Petitioner's ineffective assistance of counsel allegation

through a "doubly deferential" lens.  *Id.*  "[T]he question is not whether counsel's actions

were reasonable, [but rather], whether there is any reasonable argument that counsel

satisfied *Strickland*'s deferential standard."  *Id.*  When assessing prejudice under

*Strickland*, the question is "whether it is reasonably likely the result would have been

different" but for counsel's performance, and the "likelihood of a different result must be

substantial, not just conceivable."  *Id.*  And finally, when viewing a state court's

determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal

habeas relief is precluded "so long as fairminded jurists could disagree on the

correctness of the state court's decision."  *Id.* at 101.

> The following background information provides helpful information for evaluating

Claim Twenty:

> > On the morning of the second day of jury deliberations, Juror
> > No. 10 gave a note directly to a bailiff without going through
> > the jury foreperson.  The note said that she would like "to be
> > removed from this process, which I do not interpret as
> > facilitating justice."[4]  The trial judge discussed the note at
> > some length with counsel. Without objection from trial counsel
> > for either [Petitioner] or Jeffrey, the judge decided not to
> > address the note with Juror No. 10 or the jury as a whole.
> >
> > The note from Juror No. 10 was followed an hour later by a
> > note from the jury foreperson.  That note read:
> >
> > > We are not able to productively discuss the case
> > > due to the fact that one juror ... claims to have
> > > not collated[16] any of the evidence presented

---

[16]"In their briefs, both [Petitioner] and the State quote the handwritten note as saying
that one juror claimed not to have 'collected' any of the evidence rather than not to have
"collated" any of the evidence." *Phillips*, 2020 WL 4196649, at *1.  When addressing
Claim Twenty and Juror No. 10's note, the Delaware Supreme Court explained, "The

> from day 1. She was told not to form an "opinion" from the start and has interpreted that to mean that she should not be taking in information, putting it in perspective, and apply deductive reasoning to determine whether the events occurred as the state presents.
>
> She is upsetting all of the other jurors.

After an extensive discussion of the second note with counsel, the trial judge instructed the jury as follows:

> Good morning, Ladies and Gentlemen. In response to the note I received, please refer to the jury instructions on how to conduct deliberations. Delaware law does not permit the substitution of any juror once deliberations begin. Thank you. Would you please go back into the Jury Room.

Jeffrey objected to the sentence in the instruction informing the jurors that Delaware law does not permit the substitution of an alternate juror once deliberations begin. A fair reading of the record indicates that Otis did not object to the instruction as given.

On direct appeal, [Petitioner] argued that the instruction given in response to the second note "was coercive and premature." The Court rejected his argument, finding that "[t]he trial judge properly exercised his discretion by providing the jury with an instruction that was an accurate statement of the law and that was not coercive."

*Phillips*, 2020 WL 4196649, at \*1-2.

---

note itself seems to say 'collated.' We reach the same result reading the word as either 'collected' or 'collated.'" *Id.*

In his Rule 61 motion, Petitioner argued that trial counsel should have moved for a mistrial because the note submitted by Juror No. 10 and the Superior Court's response jeopardized his constitutional right to be tried by a jury of twelve. The Superior Court Commissioner determined that Claim Twenty was barred by Rule 61(i)(4) for being formerly adjudicated, but also rejected the Claim for failing to satisfy both prongs of the *Strickland* test. *See Phillips*, 2019 WL 4805824, at *3-4. First, the Superior Court found that trial counsel did not perform deficiently by not seeking a mistrial on this basis because, contrary to Petitioner's assertion that the note "definitively" stated Juror No. 10 failed to collect evidence and pay attention during the trial, the trial court and counsel either had different theories as to what the note said or did not understand what the note meant. Second, the Superior Court rejected Petitioner's contention that trial counsel should have asked to investigate Juror No. 10's actions, explaining that it would not second-guess trial counsel's "tactical decision to avoid singling out the juror with the hope that she would impede the jury's ability to reach a unanimous verdict." *Phillips*, 2019 WL 4805824, at *4.

The Superior Court also concluded that Petitioner failed to demonstrate prejudice. Under Delaware law, a "mistrial is appropriate only when there are no meaningful or practical alternatives to that remedy or the ends of public justice would otherwise be defeated." *Justice v. State*, 947 A.2d 1097, 1100 (Del. 2008). The jury instruction provided by the trial court was a recognizable alternative to seeking a mistrial. Consequently, Petitioner could not demonstrate a reasonable probability that the trial court would have granted a mistrial.

The Delaware Supreme Court affirmed the Superior Court's decision, agreeing that deference should be given to trial counsel's reasonable strategic choice not to seek a mistrial. *See Phillips*, 2020 WL 4196649, at \*4. The Delaware Supreme Court also agreed that Petitioner failed to demonstrate prejudice, opining:

> [Petitioner] must show that there was more than just a theoretical possibility that a mistrial would have been granted. The juror issues involved in this case were susceptible of being resolved through a jury instruction, as was done by the trial judge. There is no reason to believe that the trial judge would have seriously entertained a motion for a mistrial.

*Phillips*, 2020 WL 4196649, at \*4.

After reviewing Petitioner's instant complaint about trial counsel's actions within the context of the aforementioned record and the applicable legal framework, the Court concludes that the Delaware Supreme Court did not unreasonably apply *Strickland* when denying Claim Twenty. Importantly, Petitioner cannot demonstrate a reasonable probability that the outcome of his proceeding would have been different but for trial counsel's failure to move for a mistrial. The trial court's act of directing the jury to refer to the earlier jury instruction provided a meaningful and practical alternative to a mistrial, and did not suggest that any juror should "take a particular course of action for the mere sake of reaching a verdict." *Phillips*, 2019 WL 4805824, at \*4.

Accordingly, the Court will deny Claim Twenty for failing to satisfy § 2254(d).

## IV. PENDING MOTION

Petitioner has filed a Motion for Reconsideration of the Court's prior Order denying his motion for the appointment of counsel. (D.I. 27) Given the Court's

determination that it must dismiss the instant Petition, the Court will dismiss Petitioner's Motion for Reconsideration as moot.

## V.    CERTIFICATE OF APPEALABILITY

The Court must decide whether to issue a certificate of appealability.  *See* 3d Cir. L.A.R. 22.2 (2011).  A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Additionally, if a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling.  *See Slack,* 529 U.S. at 484.

The Court has concluded that the instant Petition fails to warrant federal habeas relief.  Reasonable jurists would not find this conclusion to be debatable.  Accordingly, the Court will not issue a certificate of appealability.

## VI.    CONCLUSION

For the reasons discussed above, the Court will deny the instant Petition without an evidentiary hearing.

The Court will issue an Order consistent with this Memorandum Opinion.